IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL McKENNA,                  :     CIVIL ACTION
WILLIAM McKENNA, and              :
RAYMOND CARNATION                 :
                                  :
          v.                      :
                                  :
CITY OF PHILADELPHIA              :     NOS. 98-5835, 99-1163


MEMORANDUM

McLaughlin, J.                                   July 7, 2009


          This is a civil rights action brought by three

Philadelphia police officers, William McKenna, Michael McKenna,

and Raymond Carnation ("Carnation"), against the City of

Philadelphia.  The plaintiffs, who are white, allege that they

suffered retaliation from the City of Philadelphia police

department after they complained about racially-discriminatory

treatment of African-American officers and filed claims of

retaliation and discrimination.

          The case was initially filed as two separate actions,

one by Michael McKenna, the other by William McKenna, Raymond

Carnation, and other, since-dismissed plaintiffs.  By agreement

of the parties, the two actions were consolidated for discovery

and then for trial.

          The Court held an eight-day jury trial on the

plaintiffs' claims in May 2008.  The claims submitted to the jury

were the plaintiffs' claims of retaliation under Title VII, 42

U.S.C. § 2000e, et seq.  Plaintiff Raymond Carnation also had equitable claims for front and back pay which were not submitted to the jury.[1]

The jury reached a verdict in favor of all three plaintiffs and found damages in the amount of $2,000,000 for Raymond Carnation, $3,000,000 for William McKenna, and $5,000,000 for Michael McKenna.  The City of Philadelphia has moved to apply Title VII's statutory cap on damages, 42 U.S.C. § 1981a(b)(3), to the verdict, and the plaintiffs have moved to avoid the statutory cap by molding the verdict to award damages under the

---

[1]     The other two plaintiffs, William McKenna and Michael McKenna, have no claims for front or back pay in this case.  In December 2006, all three plaintiffs moved to amend their complaints to add claims for wrongful termination under 42 U.S.C. § 1983 and Title VII. (Docket No. 95 in 98-5835; Docket No. 114 in 99-1163).  In their motion, all three plaintiffs contended that, even if the motion to amend was denied, they should be allowed to include their termination from the police department as damages on their existing claims.  The Court denied the motion on May 15, 2007 (Docket No. 100 in 98-5835; Docket No. 121 in 99-1163), ruling that adding the proposed additional claims would cause undue delay and prejudice and that the plaintiffs' terminations were not previously a part of the plaintiffs' claimed damages.  The plaintiffs moved for reconsideration, noting for the first time that Raymond Carnation's termination – but not that of William or Michael McKenna – was specifically mentioned in the plaintiffs' complaint as one of the retaliatory acts taken against them.  The Court therefore granted reconsideration with respect to Raymond Carnation, allowing him to seek to recover for his termination as part of his existing claims.  (Docket No. 104 in 98-5835; Docket No. 125 in 99-1163). The Court denied reconsideration as to William and Michael McKenna and has subsequently denied numerous additional motions for reconsideration seeking to add their terminations to the case.

Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 et seq.  Both motions remain pending.

The Court held a hearing on Raymond Carnation's equitable claims for front and back pay on May 18, 2009.  In this Memorandum, the Court now decides Carnation's equitable claims. The Court finds that Carnation is entitled to $208,781 in back pay for the period from his termination in March 12, 1999, through August 30, 2005, the date that Carnation became completely disabled and the date that he stopped all efforts to look for work and effectively withdrew from the workforce.  The Court finds that Carnation's disability and his withdrawal from the workforce serve to cut off his right to back pay as of that date.  The Court declines to award front pay.

I.   <u>FINDINGS OF FACTS</u>

A.   <u>Police Department Salary and Benefits</u>

Raymond Carnation was terminated from the Philadelphia police department on March 12, 1999.  The parties have stipulated to the yearly gross salary, benefits, and city pension benefits that Carnation would have earned had he continued as a Philadelphia police officer from March 12, 1999, through the end of 2009.  <u>See</u> Stipulation (Docket No. 239 in Case No. 99-1163, hereinafter "Stipulation").  The Court accepts and adopts these stipulated figures, embodied in Defendant's Equity Exhibit ("Def.

3

Eq. Ex.") 13, by reference in its findings of fact.  These
figures show that Carnation would have earned $57,270 in 1999 in
gross salary, benefits, and city pension benefits, which would
have risen steadily over time to $83,702 in 2009.

       B.   <u>Carnation's Unused Sick/Vacation/Holiday Time</u>

       Raymond Carnation received sick time, vacation time,
and paid holidays as a Philadelphia police officer.  Under
department procedures, such time, with some restrictions, could
be "banked" to be used later.  When an officer leaves the police
department, the City buys back the officer's unused "banked" sick
time or vacation time.  Up to 2,499 hours of sick time can be
bought at 50% of hourly pay; above 2,500 hours the payment is
60%.  For vacation time a maximum of 70 days or 560 hours, plus
four days or 32 hours of administrative leave will be purchased.
Holidays cannot be banked beyond a year.  If an officer has
banked time beyond the amount that can be paid back, it is
possible for the officer to use any excess immediately before his
effective retirement date.  5/18/09 Tr. at 51-52, 55, 60, 111-14.
152; Def. Trial Ex. 616.

       When Carnation was terminated he had 152 hours (19
days) of unused vacation, 64 hours (8 days) of unused holidays
and a negative balance of 39 hours (4 days, 6 hours) of sick
time, showing he was overdrawn by that amount.  Carnation was

4

paid for the net amount of his unused time, amounting to 22 days, one hour.  5/18/09 Tr. at 153-54.

Carnation prepared an estimate of the sick time, holiday time, and overtime that he would have accrued through 2020.  Carnation contends that he would have banked all of this time and would have been paid for it when he left the City's employ.  5/18/09 Tr. at 82-83.

C.   Carnation's Pre- and Post-Termination Employment

While Raymond Carnation was still employed by the police department, before his March 12, 1999, termination, he had a second job working as a night manager for a Doubletree hotel for one night a week.  Carnation began working this second job in November of 1998.  He worked at Doubletree one eight-hour shift a week for $12.00 an hour, for a total of $96.00 a week.  Carnation arranged his work at Doubletree to accommodate his police work. His employment at Doubletree was known to the police department, and was the subject of a complaint and an internal affairs investigation, but he was never asked to give up the second job. 5/18/09 Tr. at 29-30, 41, 85-86; 1/21/09 Carnation Dep. at 18-20; Def. Trial Ex. 82; Def. Trial Ex. 582.

Carnation's employment at Doubletree was "secondary" employment; his primary employment was with the police department.  Secondary employment by a Philadelphia police

officer requires department approval.  5/18/09 Tr. at 83, 133.
After being terminated from the police department, Carnation held
a series of jobs from 1999 through 2005.  One of Carnation's
contentions in his request for back pay is that his earnings from
the jobs he held after being terminated from the police
department should not be deducted from any back pay award,
because Carnation alleges he could have held these jobs as
secondary employment while working full-time as a Philadelphia
police officer.

      After Raymond Carnation was terminated from the
Philadelphia police department, he continued to work at
Doubletree for another four months, until July 1999, when
Doubletree terminated his employment.  The record before the
Court does not show how many hours a week Carnation worked at
Doubletree after he was terminated from the police department, or
why Carnation was terminated from Doubletree.  5/18/09 Tr. at 41;
1/21/09 Carnation Dep. at 18-20.

      After he stopped working for Doubletree, Carnation
worked at Credit Card Center for approximately nine months.  He
worked in shipping and loading.  He worked eight hour days, five
days a week.  The record before the Court does not establish
whether Carnation's shifts at Credit Card Center were flexible or
fixed; Carnation's testimony on this point was inconsistent.

Carnation left his employment at Credit Card Center because the company went bankrupt.  5/18/09 Tr. at 31-32, 41.

Carnation next worked at Prebelli Industries, a manufacturing company, where he worked cutting machine parts.  He worked 40 hours a week, but his hours were flexible.  Carnation started work there in August 2001, but quit after two weeks. Carnation stopped working at Prebelli because of his depression and because he was unable to focus and worried about injuring himself on the job.  5/18/09 Tr. at 33, 42, 84-85.

Carnation also worked at Tate & Kirlin, a bill collecting firm in 2001.  Carnation worked there for only one month.  He stopped going to work because of his depression.  The Court lacks sufficient basis to make a finding as to whether Carnation's working hours at Tate & Kirlin were flexible or fixed because Carnation's testimony on this issue was inconsistent. 5/18/09 Tr. at 32, 41, 85.

Carnation worked at a company called East Coast Sign from November 2001 through February 11, 2002.  Carnation presented no testimony about the length of his work week or the flexibility of his hours at East Coast Sign.  Carnation left his employment at East Coast Sign because he was laid off.  5/18/09 Tr. at 86.

Carnation was employed at Temple University Hospital beginning in April 2002 through August of 2005.  He worked as an

7

orderly, transporting patients.  He did shift work, and had some
flexibility in arranging his shifts.  At the beginning of his
employment with Temple he worked varying shifts, but later
changed to working only days.  By the end of his employment at
Temple, Carnation was working three days a week, 7:00 a.m. to
3:00 p.m.  Carnation was terminated by Temple because he
repeatedly did not report to work as scheduled. 5/18/09 Tr. at
36-37, 42, 86-87.

The parties have stipulated to the amounts earned by
Carnation from 1999 through the present as the amounts shown on
his tax returns.  Def. Eq. Ex. 1.[2]

### D   Carnation's Failure to Look for Work after 2005

After being terminated from Temple in August 2005,
Carnation has had no other employment.  Since August 2005,
Carnation has not submitted any employment applications to any
employer or had any interviews for employment of any kind.  Since
being terminated from the police department, he has never looked
for police work.  5/18/09 Tr. at 5/18/09 Tr. at 42, 49, 87-88.

Carnation believes his failure to look for work is a
symptom of his depression, which caused him to lose motivation

---

[2]     Mr. Carnation's tax returns and W-2 forms for 1999 were
not introduced into evidence; instead, an account transcript was
introduced showing Carnation's total adjusted gross income for
1999 as $18,696, without separating out Carnation's pre-
termination earnings from the police department.

and to become unable to seek employment.  5/18/09 Tr. at 42, 87-89.

> ### E   Carnation's Depression and Worker's Compensation and Social Security Disability Payments

Carnation was diagnosed with depression in 1996.  He was being treated for depression and taking anti-depression medication when he was terminated from the police department. Carnation has testified that he continues to suffer from depression to the present day.  5/18/09 Tr. at 49-50, 89-90, 101.

Raymond Carnation received worker's compensation after he left the police department.  In order to obtain worker's compensation, Carnation had to hire an attorney and pursue an appeal.  Carnation paid his attorney 20% of his worker's compensation award.  The parties have stipulated to the amounts of worker's compensation benefits paid to Carnation, as shown on Defendant's Equity Exhibit 2.  Carnation was paid benefits from 1999 through the end of 2008, and has not received benefits after December 31, 2008.  Carnation will not be required to repay any worker's compensation benefits which are offset from any equitable award in this action.  Stipulation; 5/18/09 Tr. at 50, 60-61.

Carnation was awarded Social Security disability benefits in September 29, 2008.  The Social Security Administration's ("SSA's") ruling that awarded benefits found

that Carnation became disabled as of August 30, 2005.  In the
letter awarding Carnation benefits, the SSA states that going to
work can affect an applicant's benefits but that "special rules"
can allow the SSA to continue cash benefits and health insurance
even if an applicant begins working.  5/18/09 Tr. at 90-94; Def.
Eq. Ex. 11.


      F   <u>Carnation's Conviction for Marijuana Possession</u>

      Carnation was arrested in Delaware on September 3,
2000, for possession of marijuana.  He was convicted on April 3,
2001, in the Court of Common Pleas of New Castle, Delaware, of
knowingly possessing marijuana, a Schedule I controlled substance
under Delaware law, which pursuant to 11 Del. Code § 4206(b) is a
class B misdemeanor that is punishable by up to 6 months
incarceration and a fine of $1,500.  The transcript of his trial
shows the amount of marijuana he was accused of possessing to be
one cigarette of 0.76 grams.  The City first learned of
Carnation's arrest and conviction on January 21, 2002, when he
testified to it at his deposition in this action.  Stipulation;
Def. Eq. Ex. 3; Def. Eq. Ex. 9.

      Carnation blames his use of marijuana and his
subsequent arrest on the fact that he was depressed and had
stopped taking his anti-depressant medication.  Carnation
testified that he never used marijuana while a police officer and

would never have done so had he not been terminated from the police department.  5/18/09 Tr. at 66-67.  As discussed in more detail in the Court's conclusions of law, the Court finds that Carnation's use of marijuana was caused by his depression.

Before his arrest, Carnation had stopped taking his anti-depression medication and stopped seeing his doctor. Carnation could no longer afford treatment because he did not have medical insurance while his worker's compensation claim was on appeal.  5/18/09 Tr. at 66, 72-73.

> G    The Philadelphia Police Department's Regulations
>      Concerning Drug Convictions and Marijuana Use and
>      Possession

Under Pennsylvania's "MOPEC" standards, Carnation's conviction for possession of marijuana would not have prevented his reinstatement as a police officer, or required his dismissal had he still been a police officer.  The MOPEC standards are adopted under the Municipal Police Officer Education Training Act.  Under MOPEC, for a criminal conviction to disqualify someone from being a police officer, the criminal conviction must be for a misdemeanor 2, punishable by imprisonment for a year or more.  Carnation's conviction carried a maximum punishment of only six months.  5/18/09 Tr. at 118-19.

MOPEC requirements are state minimum standards for police departments.  They do not prevent a police department from

11

Case 2:98-cv-05835-MAM   Document 237   Filed 07/07/09   Page 12 of 45


adopting more stringent requirements for hiring or retaining police officers.  5/18/09 Tr. at 132-33.

The Philadelphia police department has set a "zero tolerance" policy for drug use by its officers, and considers marijuana use or possession as a "narcotics violation," requiring suspension and dismissal.  If Carnation had still been employed by the Philadelphia police department at the time he was convicted of marijuana possession, he would have been suspended with intent to dismiss and then have been terminated.  Carnation would not have had to have been arrested or convicted for the police department to have fired him; the underlying conduct involved would have been sufficient to have him suspended and terminated.  5/18/09 Tr. at 140, 142-43, 148-52, 158-59.  Under the Philadelphia police department's Directive 79, officers who are arrested outside of Philadelphia are required to notify their commanding officer of their arrest.  5/18/09 Tr. at 138; Def. Eq. Ex. 7 p 79-6.

The disciplinary code for the Philadelphia police department does not specifically address narcotics violations.  Section 1.80 of the disciplinary code says:  "The use of a controlled substance by any member is prohibited, except when prescribed in the care and treatment of the member by a licensed medical practitioner."  The penalty is dismissal for a first offence.  Marijuana is a controlled substance under this section,

and this provision was in the disciplinary code during the relevant period.  5/18/09 Tr. at 143-45, 164-65; Def. Eq. Ex. 6.

Section 1.75 of the disciplinary code states: "Repeated violations of departmental rules and regulations and/or any other course of conduct indicating that the member has little or no regard for his or her responsibility as a member of the police department."  A first offence has a penalty range of 30 days to dismissal.  5/18/09 Tr. at 145-46; Def. Eq. Ex.6

The Philadelphia police department also has a random drug testing policy for police officers, embodied in Directive 55.  If an officer's drug tests show a level of illegal drug use above a specified amount, a so-called "hot" result, then the officer will be fired unless he has a legitimate explanation for the presence of the drug.  While a police officer, Carnation was tested for drugs but never had never had a "hot" result.  5/18/09 Tr. at 130-32.

       H    Carnation's Future Retirement Had He Remained a
            Police Officer

There is no mandatory retirement for Philadelphia police officers.  Carnation could have remained a police officer until he turned sixty-five.  Carnation testified that he believed that, had he not been fired, he would have remained a Philadelphia police officer until he was 65.  Carnation's proposed front pay damages, set out in his exhibit 82, run

13

through 2020, when he would be fifty-seven.  5/18/09 Tr. at 21,
109-111; Pl. Ex. 82.


II.  <u>CONCLUSIONS OF LAW</u>

        A plaintiff who has been intentionally subjected to an
unlawful employment practice in violation of Title VII can be
awarded equitable damages, including in appropriate circumstances
the award of back pay and front pay.  42 U.S.C. § 2000e-5(g)(1);
<u>Donlin v. Philips Lighting N. Am. Corp.</u>, 564 F.3d 207, 212 n.1.
219-220 (3d Cir. 2009); <u>Spencer v. Wal-Mart Stores, Inc.</u>, 469
F.3d 311, 315 (3d Cir. 2006).  The award of equitable damages is
left to the judgment of the court, which must exercise this power
in light of the remedial purposes of Title VII.  <u>Albemarle Paper
Co. v. Moody</u>, 422 U.S. 405, 416-17 (1975).  The purpose of
equitable damages under Title VII is "to make persons whole for
injuries suffered on account of unlawful employment
discrimination."  <u>Eshelman v. Agere Sys., Inc.</u>, 554 F.3d 426, 440
(3d Cir. 2009) (quoting <u>Albemarle</u>, 422 U.S. at 418).  In
exercising its discretion to award equitable damages, district
courts should endeavor to restore the employee to the economic
status quo that would exist but for the employer's conduct.
<u>Eshelman</u>, 554 F.3d at 441.

A.   <u>Back Pay</u>

An award of back pay is designed to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination.   <u>Donlin</u>, 564 F.3d at 218.   Under Title VII, an award of back pay is to be reduced by any "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against."   42 U.S.C. § 2000e-5(g)(1).   The standard calculation for back pay is therefore "to take the difference between the actual wages earned and the wages the individual would have earned in the position that, but for discrimination, the individual would have attained."   <u>Gunby v. Pa. Elec. Co.</u>, 840 F.2d 1108, 1119-20 (3d Cir. 1988).

The parties have stipulated to the gross salary, benefits, and pension that Carnation would have earned, had he remained a police officer, from his termination in 1999 through 2009.   The parties disagree, however, as to whether and to what extent that gross salary, benefits, and pension should be reduced by other earnings that Carnation had during the relevant period.

1.   <u>Income from other employment</u>

After Carnation was terminated from the Philadelphia police department, he held a series of jobs from 1999 through 2005.   The parties have stipulated that Carnation's earnings from

these jobs are reflected on his tax returns and on Defendant's
Equity Exhibit 13.

The City contends that the entire amount of these
earnings should be deducted from Carnation's back pay award as
"interim earnings" that are required to be deducted from back pay
under 42 U.S.C. § 2000e-5(g)(1).  Carnation counters that none of
these earnings should be deducted from his back pay award,
arguing that, had he not been discriminated against, he could
(and would) have held both his job as a Philadelphia police
officer and the other "interim" jobs he held from 1999 through
2005.  Carnation contends that he could have held these "interim"
jobs under the police department's policy allowing for "secondary
employment."

The Court finds Carnation's argument that he could have
held his post-termination jobs as "secondary employment" while
working full-time as a Philadelphia police officer unpersuasive.
Under police department policy, any secondary employment by a
Philadelphia police officer had to be approved by the department.
Carnation has presented no evidence that the employment he held
after being terminated would have been approved.  Carnation has
also presented no credible evidence that he physically could have
worked both his post-termination jobs, many of which were forty
hours a week, as well as working full-time as a Philadelphia
police officer.  Although Carnation has presented evidence that

16

some of his post-termination employment had flexible shifts, this is not enough to suggest that the police department would have allowed an officer to work a second full-time job as secondary employment or, even assuming department approval, that Carnation physically could have worked two forty-hour a week jobs.

Although Carnation held secondary employment prior to his termination from the police department, the circumstances of that employment support the Court's finding that Carnation's subsequent post-termination jobs could not have been held as secondary employment while working as a police officer.  Prior to being terminated from the police department, Carnation had held secondary employment as a night manager at the Doubletree hotel for one eight-hour shift a week.  No evidence was presented to the Court that this secondary employment was ever approved by the police department, although evidence was presented that the department knew of the employment and did not discipline Carnation for it before he was terminated.  The small number of hours Carnation actually worked as secondary employment while a police officer and the lack of evidence that even this limited employment was approved by the police department supports deducting Carnation's post-termination employment earnings from his back pay ward.

The Court, however, will not deduct a portion of Carnation's post-termination earnings at Doubletree, representing

one eight-hour shift a week from his March 1999 termination
through July 1999, when Doubletree terminated his employment.
Because Carnation was able to work this weekly eight-hour shift
prior to his termination from the police department, it is
reasonable to assume he would have been able to continue to work
this shift as secondary employment had he not been terminated.
The Court will therefore exclude $1,536 from the post-termination
earnings to be deducted from Carnation's back pay award,
representing 16 weeks of Carnation's earnings for his eight-hour
shift at $96.00 a week.

### 2. Worker's Compensation

The City contends that any back pay award to Carnation
should be reduced by the amounts he received in worker's
compensation payments.  The parties have stipulated to the
amounts and dates of these payments.  Carnation has disputed
whether his worker's compensation payments should be deducted
from his back pay award, and also argues that, if they are, they
should be reduced by 20%, representing the contingency fee
Carnation paid to the attorney representing him in his worker's
compensation proceedings.

The United States Court of Appeals for the Third
Circuit has held that back pay awards should not be reduced by
the amount of any unemployment or social security benefits

18

received by the plaintiff.  Maxfield v. Sinclair Int'l, 766 F.2d 788 (3d Cir. 1985) (social security benefits); Craig v. Y & Y Snacks, Inc., 721 F.2d 77 (3d Cir. 1983) (unemployment benefits). Both Maxfield and Craig rejected the argument that allowing a plaintiff to recover both unemployment or social security benefits would amount to an inequitable double recovery by relying on the collateral source or collateral benefit rule.  The rule, developed in tort law, provides that a payment for a plaintiff's loss from a source collateral to the defendant, such as a plaintiff's private insurance, should not be applied to reduce the defendant's damages.  See Maxfield at 793-94; Craig at 83.

The United States Court of Appeals for the Third Circuit has yet to consider whether worker's compensation benefits should be deducted from an award of back pay.  Those district courts in this circuit to have considered the issue have applied the reasoning of Maxfield and Craig and found that, unlike unemployment and social security benefits, worker's compensation benefits are not collateral payments and therefore should be deducted from back pay.  See Russell v Bd. of Pub. Ed., 2009 WL 689058 at *2 (W.D. Pa. March 11, 2009); Mason v. Assoc. for Independent Growth, 817 F. Supp. 550, 556-58 (E.D. Pa. 1993); see also McLean v. Runyon, 222 F.3d 1150, 1156 (9th Cir. 2000); but see Moysis v. DTG Datanet, 278 F.3d 819 (8th Cir. 2002)

19

(holding that worker's compensation payments should not be deducted from a back pay award under the ADA).  These cases reason that the justification for the collateral source rule -- that a wrongdoer should not get the benefit of payments that come to a plaintiff from a source collateral to the defendant -- does not apply to worker's compensation benefits because, unlike unemployment or social security benefits, worker's compensation is paid by the employer directly or by the employer's insurance. See Mason, 817 F. Supp. at 557.

The Court finds the reasoning of Russell and Mason persuasive.  Here, the parties have stipulated that, at all relevant times, the City of Philadelphia was and is a self-insured worker's compensation employer.  Carnation's worker's compensation payments were therefore paid by the City and are not from a source collateral to the defendant.  The Court will accordingly deduct the amount Carnation received in worker's compensation from his back pay award.

Carnation argues that any deduction for worker's compensation should take account of the fact that he paid 20% of his worker's compensation award to his attorney as a contingency fee for representing him in his ultimately successful pursuit of his worker's compensation award.  Carnation contends that because he personally only received 80% of his worker's compensation award, only that reduced amount should be applied to reduce his

20

back pay.  Carnation concedes that his argument is novel, and
neither he nor the City has presented the Court with any directly
relevant authority for or against Carnation's position.[3]

In reducing Carnation's back pay award by the amount he
received in worker's compensation, the Court will exclude the 20%
paid to Carnation's worker's compensation counsel in making the
reduction.  In awarding equitable damages, a court must be
mindful of Title VII's purpose to "make persons whole for
injuries suffered on account of unlawful employment
discrimination."  Albemarle, 422 U.S. at 418.  The portion of
Carnation's worker's compensation award that was paid to counsel
was not retained by Carnation.  Although the payment to counsel

---

[3]     The Court's own research has found only one reported
decision to address this issue: Marinelli v. City of Erie, 25 F.
Supp. 2d 674 (W.D. Pa. Nov 05, 1998), vacated on other grounds,
216 F.3d 354 (3rd Cir. 2000).  Marinelli involved a claim under
the Americans with Disabilities Act.  The Marinelli plaintiff,
like Carnation here, argued that his back pay award should not be
reduced by the full amount of his worker's compensation benefit,
but only by the net amount he received, less the 20% he paid to
his attorney as a contingency fee.  The Marinelli court summarily
rejected this argument, stating that the "recovery of attorney's
fees for litigating a worker's compensation claim" was governed
by the state worker's compensation statute and such fees "are not
recoverable here as damages from the defendant under either Title
VII or the ADA."  Id. at 679.  The Court is not persuaded by the
Marinelli analysis.  Reducing a Title VII back pay award by the
net amount of worker's compensation, excluding attorneys' fees,
would not constitute a "recovery" of attorney's fees under Title
VII.  Those attorney's fees would already have been recovered
under the relevant worker's compensation statute.  The question
under Title VII is whether the equitable considerations
underlying a Title VII back pay award allow (or require) that the
amounts paid to an attorney be excluded.

benefitted Carnation, it did so only by allowing him to obtain representation to successfully seek a worker's compensation award, the value of which to Carnation was the 80% he retained. In these circumstances, the Court believes that allowing the City to reduce Carnation's back pay award by the amount paid to his lawyer would be inequitable.  The Court will therefore reduce any back pay award only by the amount of worker's compensation actually received by Carnation, net of the 20% contingency fee paid to his worker's compensation attorney.

> 3.   Additional Back Pay for Sick/Holiday/Vacation Time

Although the parties have stipulated to the salary, fringe benefits, and pension that Carnation would have received had he remained a police officer from 1999 to 2009, Carnation also seeks to be compensated for the "buy back" value of "banked" sick time, vacation time, and holidays that he argues he lost as a result of his wrongful termination.  Philadelphia police officers are entitled, with restrictions, to "bank" unused sick, vacation, and holiday time.  When an officer leaves the Philadelphia police department, the department will buy back any "banked" time.  Carnation seeks to recover the value of two separate categories of "banked" time.

Carnation contends that he was not paid for time that he had accrued and "banked" as of his termination in March 1999.

22

Carnation did not produce any evidence, however, to establish that the police department failed to pay him for this time. 5/18/09 Tr. at 56, 78-81.  The Court will not include an award for this time as part of Carnation's equitable damages.

Carnation also argues that, had he remained a Philadelphia police officer, he would have continued to accrue holiday, vacation, and sick time, which if "banked" and not used, would ultimately have been bought back by the City when Carnation left the police department.  Carnation contends that he would not have used any of the time that would have accrued during the back pay period, and so should be entitled to receive the "buy-back" value of that time as part of his back pay award.  5/18/09 Tr. at 55-60.

The Court finds Carnation's argument too speculative to allow an award of damages.  The stipulated damage figures agreed upon by the parties already include an amount for fringe benefits.  To award an additional amount for the ultimate buy-out value of banked holiday, sick, or vacation time, the Court would have to have some basis to find that this time would, in fact, have been banked, rather than used, and that it would have remained unused until the time Carnation left the police department.  Other than Carnation's assertion that this would have occurred, the Court has been provided no such basis and will not award damages for the "buy out" value of this time.

23

4.   <u>Additional Recovery for Medical Benefits</u>

The parties have stipulated to the value of the fringe benefits, including medical benefits, that Carnation would have received had he remained a Philadelphia police officer. Carnation also seeks an additional recovery for medical benefits, representing the after-termination amounts that Carnation had to pay out-of-pocket for his medical insurance and medical expenses, that Carnation contends he would not have had to pay, had he remained employed as a Philadelphia police officer.  5/18/09 Tr. at 63-64.  At the evidentiary hearing, counsel for the City stated for the record that the defendant was not seeking to reduce Carnation's back pay award by the amount of whatever medical benefits Carnation obtained from his post-termination employment.  5/18/09 Tr. at 75-76.  The parties' stipulated damages include the value of the medical benefits that Carnation would have received had he not been terminated, with no off-set for any medical benefits Carnation was otherwise able to obtain. The stipulated damage amounts therefore fully compensate Carnation for the value of his medical benefits and no additional amount will be awarded.


B.   <u>Cut-off of Back Pay Based Upon After-Acquired Evidence</u>

The City seeks to curtail Carnation's entitlement to equitable damages on the basis of Carnation's September 3, 2000,

arrest and April 3, 2001, conviction for possession of marijuana. The City first learned of the arrest and conviction after this litigation began, at Carnation's deposition on January 21, 2002. The defendant contends that Carnation's arrest and conviction would have led it to terminate Carnation from the police department, had he still been employed there, and therefore Carnation's right to front or back pay should be cut off as of the date the City learned of the conviction under the after-acquired evidence doctrine established in <u>McKennon v. Nashville Banner Pub. Co.</u>, 513 U.S. 352 (1995).

In <u>McKennon</u>, a plaintiff suing for wrongful discharge under the Age Discrimination in Employment Act ("ADEA") disclosed in pre-trial discovery that she had copied and removed confidential documents before she had been discharged.  Because this conduct would have justified the plaintiff's termination, the defendant successfully moved for summary judgment, arguing that even if the plaintiff had been discriminated against, her conduct should bar her from damages.  On appeal, the United States Supreme Court reversed.

The United States Supreme Court held that after-acquired evidence of misconduct severe enough to justify the plaintiff's termination would not bar all recovery, but could be applied to limit a plaintiff's damages.  The Court recognized that ADEA, like Title VII, was intended only to prohibit illegal

discrimination, but was not intended to prevent employers from exercising their other significant interests in hiring, promoting, or discharging employees.  The Supreme Court concluded that after-acquired evidence of an employee's misconduct that would have justified termination "must be taken into account" in calculating equitable damages, "lest the employer's legitimate concerns be ignored."  Id. at 361.

The Supreme Court declined to mandate how after-acquired evidence should be used in evaluating equitable damages, holding that the issue "must be addressed by the judicial system in the ordinary course of further decisions, for the factual permutations and the equitable considerations they raise will vary from case to case."  Id., 513 U.S. at 362.  The Supreme Court predicted, however, that such after-acquired evidence would generally bar an award of front pay or restitution:  "as a general rule in cases of this type, neither reinstatement nor front pay is an appropriate remedy" because "[i]t would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds."  Id.  Such after-acquired evidence would also serve to limit an award of back pay "from the date of the unlawful discharge to the date the new information was discovered," although this could be modified by any

26

"extraordinary equitable circumstances that affect the legitimate interests of either party."  Id.

### 1    After-Acquired Evidence of Post-Termination Conduct under McKennon

McKennon involved after-acquired evidence of misconduct that occurred prior to the plaintiff's termination.  In this case, the City seeks to use after-acquired evidence of Carnation's post-termination marijuana conviction to cut off his entitlement to back pay.  In an earlier Order of December 18, 2008, this Court addressed whether the after-acquired evidence doctrine announced in McKennon applied to post-termination misconduct like Carnation's.

In that prior Order, the Court reviewed earlier federal decisions addressing whether McKennon should be extended to post-termination misconduct, noting that the United States Court of Appeals for the Third Circuit had yet to address the issue and that those federal courts to do so had sharply divided.[4]

---

[4]    Compare Sellers v. Mineta, 358 F.3d 1058, 1064 (8th Cir. 2004) (holding after acquired evidence of post-termination misconduct can be used to limit front and back pay); Cohen v. Gulf Stream Training Acad., Inc., 2008 WL 961472 (S.D. Fla. April 9, 2008) (same, at least where the post-termination conduct "directly flows" from conduct that occurs pre-petition); Smyth v. Wawa, Inc., 2008 WL 741036 (March 19, 2008) (holding that post-termination misconduct would be relevant in determining front pay); Fogg v. Gonzales, 407 F. Supp. 2d 79, 91-93 (D.D.C. 2005) (denying front pay under the "unclean hands" doctrine where plaintiff engaged in post-termination misconduct that would have caused his dismissal had he still been employed), aff'd in

In the December 18 Order, the Court adopted the
reasoning of the United States Court of Appeals for the Eighth
Circuit in Sellers v. Mineta, 358 F.3d 1058, 1064 (8th Cir.
2004).  The Sellers plaintiff had sought an equitable award of
front pay and reinstatement to her prior position under Title
VII.  The defendant sought to use after-acquired evidence of the
plaintiff's misconduct in a job she held after her termination to
preclude reinstatement and front pay.  The Sellers court held
that the after-acquired evidence of post-termination conduct

---

pertinent part, 492 F.3d 447, 456 (D.C. Cir. 2007); c.f. Medlock
v. Ortho Biotech, Inc., 164 F.3d 545, 555 (10th Cir. 1999)
(affirming district court's refusal to instruct the jury that
they could consider plaintiff's post-termination verbal abuse at
an unemployment benefits hearing in setting plaintiff's damages,
but recognizing the "possibility that in appropriate
circumstances the logic of McKennon may permit certain
limitations on relief based on post-termination conduct") with
Nesselrotte v. Allegheny Energy, Inc., 2007 WL 3147038 (W.D. Pa.
2007) (denying the defendant's motion to amend its answer to add
an after-acquired evidence defense where the evidence concerned
post-termination conduct, finding that the "after-acquired
evidence doctrine appears inapplicable"); Ryder v. Westinghouse
Elec. Corp., 879 F. Supp. 534, 537 (W.D. Pa. 1995) (refusing to
apply after-acquired evidence doctrine to post-termination
misconduct, finding that doctrine "presupposes that there was an
employee relationship at the time the misconduct occurred");
Sigmon v. Parker Chapin Flattau & Kimpl, 901 F. Supp. 667, 682
(S.D.N.Y. 1995) (finding McKennon "premised on the employee's
misconduct occurring during her employment" and inapplicable to
post-termination misconduct); Carr v. Woodbury Cty Juv. Det.
Ctr., 905 F. Supp. 619 (N.D. Iowa 1995) (excluding evidence of
plaintiff's post-termination marijuana use, reasoning that
McKennon applies only when misconduct occurs during the existence
of the employment relationship); Ryder v. Westinghouse Elec.
Corp., 879 F. Supp. 534, 537-38 (W.D. Pa. 1995) (holding that the
after-acquired evidence doctrine did not apply to the plaintiff's
disclosure of confidential information after termination).

28

could be applied to cut off the plaintiff's right to front pay, relying on the "sweeping" language of McKennon requiring lower courts to consider a plaintiff's "wrongdoing" in awarding equitable damages and instructing them to consider all "factual permutations and the equitable considerations they raise."  Id., 358 F.3d at 1063.

In its December 18, 2008, Order, this Court found the reasoning of Sellers persuasive and held that evidence of Carnation's post-termination marijuana conviction was relevant to determining his equitable damages.  McKennon's holding that a plaintiff's pre-termination misconduct must be considered in evaluating equitable damages in order to protect the legitimate interests of employers in hiring, firing, and promoting, and the broad language with which that holding is stated, supported extending that holding to post-termination conduct.  Where a plaintiff has engaged in conduct after leaving the defendant's employ that would justify refusing to re-hire him, or justify terminating him if he had remained employed at the defendant, then that fact should be taken into account in calculating equitable damages in order to take "due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing."  McKennon, 513 U.S. at 361.

29

     2    The Severity of Carnation's Post-Termination
          Conduct

     In weighing the effect of Carnation's arrest and
conviction, the City bears the burden of establishing that
Carnation's misconduct "was of such severity that [he] in fact
would have been terminated on those grounds alone," if Carnation
had still been employed by the City.  McKennon, 513 U.S. at 362-
63; see also Sellers, 358 F.3d at 1064.  The Court finds that the
City has met this burden.

     The City presented testimony from Deputy Commissioner
John Gaittens of the Philadelphia police department, the officer
in charge, among other responsibilities, for police personnel and
labor grievances.  Commissioner Gaittens testified that, under
the Philadelphia police department's "zero tolerance" policy, an
officer like Carnation, who had been arrested and convicted of
marijuana possession, would have been terminated from the police
department.  Although Carnation introduced evidence that, because
his conviction was a misdemeanor, it would not bar him from being
a police officer under the state MOPEC standards, Commissioner
Gaittens testified that the MOPEC standards were minimum
standards set by the state and that Philadelphia was permitted to
implement more stringent standards, and had in fact done so.
5/18/09 Tr. at 117-20, 132-33.

3    The Causal Relationship Between Carnation's Post-
        Termination Misconduct and the Defendant's Actions

The Court must also consider to what extent Carnation's marijuana conviction was caused by the City's unlawful discrimination against him.  In its December 18, 2008, Order, the Court noted that, in order to cut off equitable damages, a plaintiff's post-termination wrongdoing must not be attributable to the defendant's conduct, citing Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 555 (10th Cir. 1999).

In Medlock, the United States Court of Appeals for the Tenth Circuit declined to decide whether the McKennon after-acquired evidence doctrine applied to post-termination conduct, although noting that the logic of the decision "may permit certain limitations on relief based on post-termination conduct." Instead, finding that the plaintiff's alleged misconduct occurred "at a hearing occasioned by the plaintiff's termination," the court held that the after-acquired evidence doctrine had no application where the alleged misconduct "arises as a direct result of" the defendant's discriminatory actions.  Id., 164 F.2d at 555.

Carnation argues that his marijuana conviction was directly caused by the discrimination he suffered from the City. Carnation testified that he never used marijuana until after he was terminated from the police department and that, had he remained an officer, he would never have used it.  He attributes

31

his use of marijuana to the exacerbation of his pre-existing depression by the discrimination and retaliation he suffered from the police department and by his wrongful termination.  He also attributes his use of marijuana to the fact that he was no longer treating his depression.  Carnation testified that he stopped taking anti-depressant medication and seeing a physician because he lacked worker's compensation coverage while his worker's compensation award was being appealed by the City and, without insurance, could not pay for medical treatment for his depression.

The City does not dispute that Carnation suffered from depression, but argues that Carnation cannot rely on his own testimony to establish that his depression was exacerbated by his termination or that it led to his use of marijuana.  The City describes these as issues of "medical causation" requiring expert testimony.

The Court does not believe Carnation was required to present expert testimony to establish that his depression was exacerbated by the City's wrongful conduct or that his depression led him to use and be convicted of possession of marijuana.  Expert testimony is unnecessary if "the primary facts can be accurately and intelligently described" to the factfinder and if the factfinder is "as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses

possessed of special or peculiar training, experience, or observation in respect to the subject under investigation." Wilburn v. Maritrans G.P. Inc., 139 F.3d 350, 359 (3d Cir. 1998) (internal quotation and citation omitted).  In addition, because of the remedial purpose of civil rights laws, courts have applied a relaxed causation standard in Title VII cases and have not required expert testimony to prove a defendant's actions caused a plaintiff emotional distress.  Bolden v. Southeastern Pa. Trans. Auth., 21 F.3d 29, 35-36 (3d Cir. 1994).

In this case, the jury found that the City discriminated and retaliated against Carnation and wrongfully terminated him, and that these actions caused Carnation to suffer emotional distress damages that the jury valued at $2,000,000. From these facts, and from Carnation's testimony as to his mental state and the reasons for his using marijuana, the Court finds it has sufficient information, without expert testimony, to evaluate whether Carnation's conviction for marijuana possession was a sufficiently direct result of the City's wrongful acts to justify discounting the conviction in assessing Carnation's back pay.

From the facts before it, the Court finds that Carnation's use of marijuana and his resulting conviction are sufficiently causally related to the City's discrimination that it would be inequitable to cut off Carnation's back pay as a result of the conviction.  In reaching this conclusion, the Court

follows the mandate of <u>McKennon</u> to evaluate all the "factual
permutations and the equitable considerations they raise" in
assessing the effect of after acquired evidence  <u>Id.</u>, 358 F.3d at
1063.

Here, Carnation's conviction stems from one incident
involving his possession of one marijuana cigarette.  No evidence
was presented to the Court that Carnation ever used marijuana on
any other occasion.  The incident occurred within a year and a
half of Carnation's wrongful termination, at a time when the City
has not disputed that he suffered from depression.  From the jury
verdict in Carnation's favor, the jury clearly concluded that
Carnation's wrongful termination and the discrimination he
suffered caused him emotional distress and exacerbated his pre-
existing depression.  Carnation testified credibly that his use
of marijuana was uncharacteristic of him and a result of his
depression.  From these facts the Court concludes that
Carnation's use of marijuana was directly related to his
depression, whose severity was exacerbated by the City's conduct.

Carnation also testified that, at the time of his
marijuana conviction, his depression was untreated because he
could not afford medical treatment and lacked medical insurance
because his worker's compensation award (which would have
provided him with medical insurance) was being appealed by the
City.  Although no credible evidence has been presented that the

34

appeal of Carnation's worker's compensation award was motivated
by discrimination or retaliation, Carnation's lack of medical
treatment is nonetheless directly related to his unlawful
termination.  Had Carnation not been wrongfully terminated, he
would have continued to have been employed by the Philadelphia
police department and would have had the insurance and the salary
to treat his depression.

        In evaluating an equitable award of back pay, this
Court is directed to attempt to "make victims of unlawful
discrimination whole by restoring them to the position they would
have been in absent the discrimination."  Donlin, 564 F.3d at
218.  Here, the Court concludes that, had Carnation not suffered
discrimination and retaliation and not been wrongfully terminated
by the City, he would not have committed the misconduct that
resulted in his conviction for marijuana possession.  Although
the Court has found that after-acquired evidence of a plaintiff's
post-termination misconduct can cut off an award of back pay in
appropriate circumstances, it should only do so where that
misconduct is independent of the defendant's wrongdoing.  Where,
as here, it is more likely than not that the misconduct at issue
would not have occurred in the absence of the defendant's
wrongdoing, then it would be inequitable to use that misconduct
to cut off the plaintiff's right to back pay.

35

C    Cut-off of Back Pay Based Upon Carnation's Failure to
     Mitigate and Carnation's Disability

     The City seeks to cut off Carnation's entitlement to
back pay as of August 30, 2005.  The City contends that, as of
that date, Carnation stopped looking for work and effectively
withdrew from the workforce, thereby failing to mitigate his
damages and cutting off his right to back pay.  The City also
contends that Carnation's back pay should be cut off as of August
2005 because the SSA found Carnation to be totally disabled as of
that date.  The Court agrees with both of these arguments.


     1.   Failure to Mitigate

     A Title VII plaintiff has a statutory duty to mitigate
damages.  Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32 (1982)
(citing 42 U.S.C. § 2000e-5(g)).  The burden of proving a failure
to mitigate is the City's.  Robinson v. Southeastern Pa. Trans.
Auth., 982 F.2d 892, 897 (3d Cir. 1993).  The usual means of
proving a failure to mitigate is by proving that there was
substantially equivalent work available to that previously held
by the plaintiff and that the plaintiff failed to exercise
reasonable diligence to obtain it.  Le v. Univ. of Pa., 321 F.3d
403, 407 (3d Cir. 2003).

     Here, the City has failed to establish that there was
substantially equivalent work available to the plaintiff.
Although the City presented evidence that the Philadelphia police

36

department had a hiring class every year, (5/18/09 Tr. at 101-02), this does not establish the availability of substantially equivalent work because the City also established that Carnation could not have been re-hired by the police department because of his marijuana conviction.  The City presented no evidence as to whether substantially equivalent employment was available to Carnation in jurisdictions outside Pennsylvania, or in other Pennsylvania jurisdictions which might follow the less stringent state MOPEC standards under which Carnation's conviction would not have disqualified him from being hired.

Although the City has failed to establish the availability of substantially equivalent employment, it can still establish a failure to mitigate by showing that Carnation withdrew from all participation in the workforce.  Tubari Ltd., Inc. v. N.L.R.B., 959 F.2d 451, 454 (3d Cir. 1992) ("[A]n employer meets its burden on the mitigation issue by showing that the employee has withdrawn from the employment market.").  Here, Carnation conceded that he had stopped looking for employment after he was discharged from Temple University in August 2005. Carnation testified that, between August 2005 and his testimony at the May 2009 hearing, he had submitted no applications for employment to any employer.  The Court finds that Carnation's complete failure to search for any employment in this period

amounts to a complete withdrawal from the job market, justifying a cut off of back pay as of the end of August 2005.

### 2.   Carnation's Disability

The United States Court of Appeals for the Third Circuit has stated that "as a general rule, an employment discrimination plaintiff will not be allowed back pay during any periods of disability." Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1101 (3d Cir. 1995) (quoting Mason, 817 F. Supp. at 554) (internal quotation and brackets omitted); see also N.L.R.B. v. Louton, Inc., 822 F.2d 412, 415 (3d Cir. 1987) ("An employer is not generally liable for back[ ]pay for periods when an employee is unavailable for work due to a disability.").

The rationale behind this rule is that, because back pay is a compensatory remedy intended to restore the plaintiff to the position that he would have been in had he not been discriminated against, a plaintiff should not be able to receive back pay for a period when he was unable to work for reasons unrelated to the defendant's conduct.  See Pierce v. Southeastern Pa. Trans. Auth., 2003 WL 21294905 at *3 (E.D. Pa. Feb. 12, 2003); Olabode v. Hecht Inc., 1997 WL 805187 at *10 (E.D. Pa. Dec. 30, 1999).  The corollary to this rule is that it does not apply where the defendant's actions caused the disability. Savarese v. Agriss, 883 F.2d 1194, 1206 n.19 (3d Cir. 1989).

38

Here, the Court finds that Carnation was completely disabled as of August 30, 2005.  Carnation applied for Social Security disability benefits in June 2008 and was awarded those benefits in September 2008.  In its finding awarding Carnation benefits, the SSA determined that Carnation became completely disabled as of August 30, 2005, and awarded benefits as of that date.  Carnation contends that the SSA's determination does not conclusively establish that he was totally disabled because the award was not final and because it stated that Carnation could work and still receive benefits under certain circumstances.

The Court agrees that the SSA's finding of complete disability is not binding on this Court.  The SSA's finding, however, can still be considered by this Court as evidence of Carnation's disability.  See, e.g, Shomide v. ILC Dover, Inc., 521 F. Supp. 2d 324, 334-35 (D. Del. 2007) (relying on SSA's finding of complete disability to cut off back pay, in the absence of any evidence from the plaintiff that he was able to return to work).  Here, the SSA's finding of complete disability is supported by Carnation's own testimony at the evidentiary hearing, in which he explained that his failure to look for work from August 2005 through the May 2009 hearing was due to his debilitating depression.  He testified that, in this period, he "lost motivation in life" and was unable to hold down a job or even look for employment:  "what I would basically do is sleep so

39

just sleeping was -- you know that was my life . . ."  5/18/09

Tr. at 88-89.  Carnation testified that he continues to be

diagnosed with severe depression and remains under a doctor's

care for the condition.  5/18/09 Tr. at 101.  Based on both the

SSA's finding and Carnation's testimony, the Court finds that

Carnation was completely disabled as of August 30, 2005.

The Court also finds that Carnation's disability was

not caused by the City's actions.  Although the Court has found

that Carnation's September 2000 arrest for marijuana possession

was caused by his depression which was exacerbated by the City's

wrongful actions, the same reasoning does not apply to

Carnation's severe depression in August 2005.  The intervening

five years and the several jobs that Carnation held during that

time establish that whatever effect the City's discrimination in

1998 and 1999 had on Carnation did not prevent him from obtaining

employment or cause him to become completely disabled.  C.f.

Johnson v. Spencer Press Inc., 364 F.3d 368, 383-84 (1st Cir.

2004) (finding that a plaintiff's depression, which caused him to

cease looking for work, was not causally related to the

defendant's discrimination, where seven months had elapsed and

plaintiff had held intervening employment).  The Court finds that

whatever happened in 2005 to cause Carnation's depression to

intensify and cause him to become completely disabled is not

related to the defendant's actions six years earlier.  Because

40

the City's actions did not cause Carnation's disability, his
disability will act to cut off his entitlement to back pay as of
August 30, 2005.


        D     <u>Front Pay</u>

       Carnation has sought an award of front pay, extending
from the present to 2020, the year he contends he would retire.
An award of front pay is intended to compensate for a loss of
future earnings after judgment, either for the period between
judgment and reinstatement, or if reinstatement is not available,
as an alternative to being reinstated.  <u>Pollard v. E.I. du Pont
de Nemours & Co.</u>, 532 U.S. 843, 846 (2001); <u>Donlin</u>, 564 F.3d at
219-220.

       The Court's finding that Carnation became completely
disabled in August 2005 prevents Carnation from recovering front
pay.  An award of front pay would be inappropriate where it would
"catapult the plaintiff into a better position than [he] would
have enjoyed in the absence of discrimination." <u>Donlin</u>, 564 F.2d
at 220 (quoting <u>Ford v. EEOC</u>, 458 U.S. at 234) (internal
quotations and brackets omitted); <u>see also</u> <u>Russell v. Bd. of Pub.
Ed. of Sch. Dist. of Pitt.</u>, 2008 WL 4671499 (W.D. Oct. 21, 2008
(denying award of front pay to plaintiff who was completely
disabled).  Here, awarding front pay to Carnation when he is
completely disabled and unable to work would put him in a better

41

position than he would be in had he not been discriminated against.  The Court will therefore decline to award front pay on the basis of the plaintiff's disability.

     The Court will also deny Carnation's request for front pay for a second independent reason.  The only evidence Carnation presented to quantify the damages he sought as front pay was his own testimony as to the number of years he intended to work and his estimates of his future earnings, fringe benefits, and pension benefits.  The City presented no evidence as to those damages.  In its recent decision in Donlin v. Phillips Lighting, the United States Court of Appeals for the Third Circuit reversed an award of front pay based on a plaintiff's testimony as to her future earnings where, as here, the plaintiff was not a professional and where her testimony went beyond "easily verifiable facts within her personal knowledge and instead required forward-looking speculation for which she lacked the necessary training."  Id., 564 F.2d at 216-17.  Donlin distinguished prior cases where lay witnesses possessed adequate personal knowledge of their projected future earnings from long experience with their employer or where calculations were simple. Id. at 215 (distinguishing Paolella v. Browning-Ferris, Inc., 158 F.3d 183 (3d Cir. 1998) and  Maxfield v. Sinclair Int'l, 766 F.2d 788 (3d Cir. 1985)).  The Donlin court concluded that the plaintiff's testimony concerning her calculation of front pay was

42

inadmissible under Federal Rule of Evidence 701 because the plaintiff lacked a "reasonable basis grounded either in experience or specialized knowledge for arriving at the opinion that he or she expresses," and that a front pay award based on such testimony could not stand.   Id. at 217.

Here, the Court finds that Carnation similarly has not established that he had sufficient personal knowledge to give a lay opinion as to his projected future earnings.  Carnation has no expertise in accounting or financial calculations.  He was last employed by the Philadelphia police department a decade ago and presented no evidence that he had any familiarity with their current pay structure or benefits beyond what he learned in this litigation.  Carnation presented no explanation as to how he calculated his proposed front pay figures or what assumptions he made in preparing them.  The Court therefore finds Carnation's evidence insufficiently reliable to support an award of front pay damages.


E    Calculation of Equitable Damages

For the reasons set out above, the Court has found that Carnation is entitled to an award of back pay from the date of his termination through August 30, 2005, but is not entitled to front pay.

The parties have stipulated to the yearly amounts that Carnation would have earned in salary, benefits, and pension as a Philadelphia police officer for the years 1999 through 2005.  The Court will use the stipulated amounts for the years 1999 through 2004, inclusive, (totaling $377,524) and a pro-rated 2/3 of the amount for 2005, representing 2/3 of a full year from January through August (totaling $48,347).  The total amount before set-offs is therefore $425,871.

The Court will then set off this amount by the income Carnation earned between his termination and August 30, 2005, less the amount that Carnation could have earned from four months of his eight-hour weekly shift at Doubletree that the Court found could be excluded as secondary employment.  The parties have stipulated that the amount of Carnation's wages from termination through August 30, 2005, as shown on his tax returns, is $118,550.  Subtracting the $1,536 that Carnation could have earned as secondary employment at Doubletree leaves $117,014 in earnings to be offset against the back pay award.

The Court will also set off this amount by the amount of worker's compensation benefits received by Carnation in this period, less the 20% of those benefits paid to his worker's compensation attorney.  Using the stipulated worker's compensation figures provided by the parties, the amount of

44

worker's compensation benefits received up through August 30, 2005, is $125,095 of which 80% is $100,076.

Combining the amounts for earnings and worker's compensation, the total amount to be set-off from the back pay award is $217,090.

After applying the set-off amount, the Court will award Raymond Carnation back pay in the amount of $208,781.


F.   Adjustment for Tax Impact of Lump Sum Award

Carnation has stated that, depending on the amount of his equitable damage award, he might seek to have his award adjusted to reflect the tax impact of receiving his back pay in a lump sum, an adjustment recently approved in appropriate circumstances in Eshelman v. Agere Sys., Inc., 554 F.3d 426, 440 (3d Cir. 2009).  The Court will allow Carnation to file a motion requesting such an adjustment within 10 days of this Order.


An appropriate Order will be issued separately.

45